UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

SHANEEKA LEVETTE HARRIS-BETHEA,    )
                                   )
                Plaintiff,         )
                                   )
v.                                 )    No.: 3:13-CV-669-TAV-HBG
                                   )
BABCOCK & WILCOX TECHNICAL         )
SERVICES Y-12, LLC,                )
                                   )
                Defendant.         )

## MEMORANDUM OPINION

This civil action is before the Court on the Motion for Summary Judgment by

Babcock & Wilcox Technical Services Y-12, LLC [Doc. 35]. Plaintiff responded in

opposition [Doc. 41], and defendant replied [Doc. 47]. The Court has carefully

considered the matter and, for the reasons stated herein, will grant defendant's motion as

to plaintiff's claims.

## I.    Background

Plaintiff Shaneeka Levette Harris-Bethea worked as a Wellness Coordinator in the

Environment, Safety & Health organization (ES&H) within defendant Babcock &

Wilcox Technical Services Y-12, LLC [Docs. 40 ¶¶ 2, 3; 42 ¶ 1]. Defendant operates a

national security complex that manufactures and dismantles nuclear warhead

components, and houses the nation's supply of weapons-grade, highly-enriched uranium

[Doc. 40 ¶¶ 2, 3]. Defendant operates on funding provided by Congress, and its

procurement policies for managing and accounting for taxpayer dollars are strict [Doc. 40-1 p. 23].

Plaintiff was hired to develop, plan, implement, and evaluate new health and wellness programs [Docs. 40 ¶ 4; 42 ¶ 3]. Doug LeVan, Manager of the ES&H Performance Improvement department, supervised plaintiff [Doc. 40-1 p. 18]. Over time, plaintiff trained to achieve Subcontract Technical Representative ("STR") authority [Docs. 40 ¶ 10; 42 ¶ 5]. Defendant submits that, due to the expansion of her job responsibilities, plaintiff's STR authority became an essential function of her job [Doc. 40-1 p. 5].

Federal law requires defendant to administer random drug testing for all of its employees who have been granted a certain level of security clearance by the United States Department of Energy [*Id.* p. 312]. Plaintiff held this level of security clearance, and was therefore subject to random drug screening [*Id.* p. 12]. In October 2009, plaintiff was notified that she needed to report for a random drug test within 1.5 hours [*Id.* p. 312]. Plaintiff states that she intended to take her scheduled drug screen, but forgot and instead went home [Docs. 40 ¶ 25; 42 ¶ 34]. She submits she was not offered a chance to provide a late drug test [Doc. 42-5 p. 34].

Under the governing federal regulation, 10 C.F.R. § 707.12(b)(1), individuals who fail to cooperate with the drug screening are treated as if they had been tested and had been determined to have used an illegal drug [Doc. 40 ¶ 25 n.8]. Defendant treated plaintiff's failure to report for her random drug test as her having refused to cooperate

2

with the process [Doc. 40-1 p. 20]. Plaintiff was therefore treated as if she had tested positive for illegal drugs on her drug screen [*Id.*].

Plaintiff was placed on administrative leave for one week as defendant determined what it should do as a result of plaintiff's missed drug screen, as no other employee had ever left defendant's worksite after missing a drug test [Docs. 40 ¶ 26; 42 ¶ 37]. Thereafter, defendant required plaintiff to submit a hair sample to be analyzed for illicit drugs, at her own expense, which she did [Doc. 40-1 p. 312]. Plaintiff's hair sample test came back negative for any illegal drugs [*Id.*]. Plaintiff was then placed on a twelve-month probationary period, which would include more frequent unscheduled drug tests [Docs. 40 ¶ 32; 42 ¶ 38].

Under defendant's policy, observed drug tests are required when someone has had a positive drug screen, among other reasons [Doc. 40-1 p. 21]. As plaintiff was being treated as if she had tested positive for illegal drugs on a drug screen, all of her future drug tests needed to be provided under observation, in accordance with the federal protocol for observed specimen collection [*Id.*]. During her probationary year, plaintiff needed to provide an observed urine specimen [*Id.*]. Plaintiff submits that no other employee—including white, black, male, and female employees—has ever been required to provide an observed drug screen for having missed a prior screen [Doc. 42 ¶ 33].

Plaintiff also maintains that during her employment with defendant, LeVan denied her leadership training, business trips, and advancement opportunities, while white males "frequently" went on such trips with LeVan [Docs. 40 ¶ 38; 42 ¶ 44; 42-5 p. 28]. She

3

also submits that LeVan cited her for violating time and attendance policies, while white employees could come in when they wanted [Doc. 42 ¶ 53].[1]  She states she was also required to knock on LeVan's door before entering his office, whereas white employees were not required to do so [*Id.* ¶ 47].[2]  She also submits that LeVan would sometimes use the word "bitch" when describing Yvonne Bishop, one of plaintiff's supervisors, but that this was part of a "culture" of foul language at work and she soon "let it go" [Doc. 42-5 p. 820].  During this same period, LeVan recognized plaintiff for her outstanding work [Doc. 40-1 p. 19].

Defendant submits that during her employment, plaintiff made several procurement mistakes in which she ignored defendant's procurement rules, thereby misspending government funds [Doc. 40-1 p. 23].  Procurement is an STR function [Doc. 42 ¶ 7].  Plaintiff submits that she was acting upon her supervisor's instructions regarding certain procurements [*Id.* ¶ 11].  These incidents prompted Nancy Johnson, the Vice-President of Business Services, to request that the Ethics Department audit plaintiff's

---

[1] The record contains the e-mail LeVan sent plaintiff to which she is referring.  In this email, he states: "Levette, [f]or the past seven weeks, your time and attendance has been very inconsistent.  You have called in late at least once every week and have only worked a ten hour day several times.  This does not meet the spirit or intent of the flexible work schedule. . . . I understand there will be times when 'life happens'. [sic]  Those times should be the exception, not the rule.  This is the last time this will be addressed informally" [Doc. 40-1 p. 296].

[2] The record contains the e-mail LeVan sent plaintiff to which she is referring.  This e-mail was meant to serve as "official documentation" of what he and plaintiff discussed in a meeting.  He wrote: "One thing we did not discuss was office protocol.  It is common courtesy and a show of respect to knock on someone's office door and ask if they have time to discuss whatever you need to discuss; it is not acceptable to just walk into someone's office and start a conversation" [Doc. 40-1 p. 297].

4

procurement practices in September 2011—approximately two years after plaintiff's missed drug screen [*Id.* ¶¶ 11, 12 n.3].

The Ethics Department investigation into plaintiff's procurement activity revealed that plaintiff had "violated many established policies and authorities" [Doc. 42 ¶ 12 n.3]. As a result of these alleged violations, defendant needed to pay over $100,000 in reimbursement to the government [*Id.* ¶ 10]. Plaintiff submits that her alleged violations are inaccurate [*Id.* ¶ 11].

After reviewing the Ethics Department's investigation, Lori Riley, the STR Program Manager, and Johnson agreed that plaintiff's STR authority should be revoked [Doc. 40-1 pp. 10–11]. This revocation was communicated to plaintiff's managers, including to Bishop, on November 1, 2011 [*Id.*]. As plaintiff's STR status was revoked, defendant submits that she was no longer qualified to be a Wellness Manager [*Id.*]. Bishop contacted Diane Grooms, Employment Services and Recruiting Director, to discuss what other jobs, if any, would be available for plaintiff to perform [*Id.*]. Grooms and Bishop determined that the only available position for which plaintiff was still qualified was in the ES&H training section [*Id.*].

On November 2, 2011, plaintiff met with Bishop and Grooms regarding the procurement investigation and her job status [Docs. 40 ¶ 14; 42 ¶ 17]. In that meeting, Bishop informed plaintiff of her violations found in the Ethics Department investigation [Docs. 40 ¶ 14; 42 ¶ 17]. Plaintiff was told both verbally and in writing that her STR authority was being revoked [Docs. 40 ¶ 14; 42 ¶ 8]. As being an STR was an essential

5

function of her job, plaintiff was also informed that she could no longer remain a Wellness Coordinator. Plaintiff submits that she was never told that she needed to be an STR in order to maintain her position [Docs. 40 ¶ 14; 42 ¶¶ 8, 9].

Rather than terminating plaintiff as a result of her policy violations, Grooms and Bishop offered plaintiff a different position at the same pay rate [Docs. 40 ¶ 15; 42 ¶ 18]. Plaintiff claims she was led to believe that this new position was without the possibility of advancement, although defendant disputes this fact [*Id.*]. Grooms and Bishop informed plaintiff that she could take the following day off of work, with pay, to consider the proposed transfer [Doc. 40-1 p. 6]. Plaintiff alleges she told Grooms and Bishop that the revocation of her STR authority and position transfer was the result of discrimination and harassment [Docs. 40 ¶ 16; 42 ¶ 19]. Plaintiff also notes that her supervisor, a white male, still has his job, despite the results of the investigation [Doc. 42 ¶ 13].

Toward the end of the meeting, Bishop informed plaintiff that she would retrieve plaintiff's personal items from plaintiff's office [Doc. 40-1 pp. 6–7]. When Bishop asked plaintiff what she wanted Bishop to retrieve, plaintiff stated "my purse" [*Id.*]. Defendant then submits that plaintiff proceeded to "bolt[ ] out of Bishop's office toward her own office," walking at a "fast pace," with which Bishop and Grooms could not keep up [*Id.* p. 11]. Plaintiff states that she was never told that she could not accompany Bishop and Grooms to retrieve her purse [Doc. 42 ¶ 20]. She also submits that they did not ask her to stop once she began walking to get her purse [*Id.*].

6

When plaintiff entered the Wellness Center, which is where her office was located, she allegedly stated "[t]he bitch is taking my job because I'm not doing a good enough fucking job as an STR," or similar words to that effect [Doc. 40 ¶ 18]. Jennifer Jefferis and Tamara Anderson, defendant's employees who were working in the fitness facility at the time, are both uncertain of plaintiff's exact statement, but are certain that she used the specific terms "bitch" and "fucking," and that she communicated she lost her job [Doc. 40-1 pp. 3, 16].

Plaintiff states that her comments were not directed at any particular person, and were not clearly understood by anyone [Doc. 42 ¶ 22]. She admits that she may have used the term "bitch," but that it was not directed at her supervisor [*Id.*]. She agrees that if she had called Bishop a bitch to her face, it would be appropriate to discipline her [*Id.* ¶ 23]. She maintains, however, that there was a culture of using foul language at defendant's workplace [*Id.*]. This "culture" includes LeVan's alleged repeated use of the word "bitch," including to describe Bishop [*Id.*].

Management officials learned of plaintiff's comments in the Wellness Center five days after the incident, on November 7, 2011 [Doc. 40-1 p. 12]. The Human Resources Department started an investigation that same day [*Id.*]. This investigation concluded that plaintiff had violated defendant's Standards of Conduct and Business Ethics, which prohibit the use of abusive or threatening language while on work grounds, and refusing to carry out verbal instructions [*Id.*].

7

After this incident, plaintiff received intermittent leave under the Family Medical Leave Act ("FMLA") because she was not sleeping and was suffering from panic attacks [Doc. 42 ¶¶ 54, 56]. One week after the incident, after being briefed on the results of the Human Resources investigation, William Reis, Vice President of ES&H, decided to terminate plaintiff [Doc. 40-1 p. 26]. Defendant has a long-standing practice of attempting to conduct terminations in person [Doc. 40-1 p. 12]. At that time, plaintiff was out of work on FMLA leave, and was due to return on November 21, 2011 [*Id.*]. Accordingly, despite having decided to terminate plaintiff as of November 14, 2011, defendant delayed notifying plaintiff of her termination until she returned one week later [Docs. 40 ¶ 20; 42 ¶ 30].

Bishop scheduled a meeting with plaintiff for November 21, 2011, the date she was due to return from her FMLA leave [Doc. 40-1 p. 6]. On the morning of that meeting, plaintiff notified Bishop that her physician was extending her FMLA leave, and her expected return date would be December 19, 2011 [*Id.* p. 7]. Thereafter, defendant decided to send plaintiff a termination letter dated November 22, 2011, stating that the grounds for plaintiff's termination were her insubordination and the abusive and threatening language she used toward her supervisor [*Id.*; Doc. 42 ¶ 57].

After being terminated, defendant hired Gary Hall to serve in plaintiff's old position [Doc. 42 ¶ 4]. Plaintiff maintains that Hall is "a less-qualified white man" who was not required to be an STR [*Id.*]. Defendant submits that Hall became STR-certified

8

as soon as he could receive the training, and that, had he not, he would not have been able to maintain this position [Doc. 47-1 pp. 4–5].

Following her termination, plaintiff filed suit against defendant [Docs. 1, 10]. Defendant filed a partial motion to dismiss [Doc. 20], which the Court granted in part and denied in part [Doc. 29]. Plaintiff's remaining claims before the Court are for: (1) creating a hostile work environment due to harassment on the basis of race and gender, pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981 ("§ 1981"); (2) wrongful termination due to discrimination based on her gender and race, in violation of Title VII and § 1981; (3) FMLA retaliation and interference; (4) disability discrimination in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"); and (5) retaliatory discharge in violation of Title VII [Docs 10, 29].

## II. Standard of Review

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986); *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 339 (6th Cir. 1993). All facts and all inferences to be drawn therefrom must be viewed in the light most favorable to the nonmoving party.

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 301 F.3d 937, 942 (6th Cir. 2002).

Yet, "[o]nce the moving party presents evidence sufficient to support a motion under Rule 56, the nonmoving party is not entitled to a trial merely on the basis of allegations." *Curtis Through Curtis v. Universal Match Corp.*, 778 F. Supp. 1421, 1423 (E.D. Tenn. 1991) (citing *Celotex*, 477 U.S. at 317). To establish a genuine issue as to the existence of a particular element, the nonmoving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The Court's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The Court does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Nor does the Court search the record "to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir. 1989). Thus, "the inquiry performed is the threshold inquiry of determining whether there is a need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250.

## III. Analysis

Defendant moves the Court to dismiss plaintiff's claims as a matter of law, as there is no genuine dispute over any material facts [Doc. 40 p. 17]. Plaintiff responded in opposition, arguing there are genuine disputes of material facts [Doc. 42 p. 30]. The Court will analyze each of plaintiff's remaining claims in turn.

### A. Hostile Work Environment Claim

Plaintiff alleges that she worked in a hostile work environment based on both race and gender, under Title VII and § 1981. Claims under Title VII and § 1981 are subject to the same standards. *Nicholson v. City of Clarksville, Tenn.*, 530 F. App'x 434, 442 (6th Cir. 2013).

For plaintiff to succeed on a hostile work environment claim, she must demonstrate that: (1) she belonged to a protected group; (2) was subjected to unwelcomed harassment; (3) this harassment was based on her belonging to the protected group; (4) "the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment[;]" and (5) defendant knew or should have known about the harassment, and failed to take action. *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011) (citation omitted). In other words, plaintiff must show that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*,

510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986)) (internal citations omitted).

"A plaintiff may prove that harassment was based on race by either (1) direct evidence of the use of race-specific and derogatory terms or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace." *Id.* (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80–81 (1998) (approving these methods in the analogous context of sexual harassment)). The harassment need not be explicitly based on race or gender to be illegally race- or gender-based, if the plaintiff shows that but for her race or gender she would not have been subjected to the harassment. *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007).

When looking to the third prong of this inquiry, plaintiff must demonstrate that the harassment was undertaken because of her race or gender. *Trepka v. Bd. of Educ.*, 28 F. App'x 455, 461 (6th Cir. 2002) (holding that a plaintiff must demonstrate that the harassing conduct "was motivated by a bias towards the employee's protected class" rather than personal dislike). For example, in *Bowman v. Shawnee State University*, 220 F.3d 456 (6th Cir. 2000), when analyzing a hostile work environment claim based on the plaintiff's gender, the Sixth Circuit noted that while the plaintiff had recited "a litany of perceived slights and abuses," many of the alleged harassing acts could not be considered in the hostile work environment analysis because they were not "based upon his status" as a male. *Id.* at 464. As a result, even though the plaintiff had been subject to

"intimidation, ridicule, and mistreatment," he could not establish a hostile working environment under Title VII or § 1981 because he failed to demonstrate that this alleged conduct occurred because of his gender. *Id.*

To satisfy the fourth element, "conduct must be severe enough or pervasive enough to create an environment that a reasonable person would find hostile or abusive." *Id.* at 463. "[W]hether an environment is 'hostile' or 'abusive' can only be determined by looking at all the circumstances." *Harris*, 510 U.S. at 23. A court should consider harassment "by all perpetrators combined," instead of "divid[ing] and categoriz[ing] the reported incidents." *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (analyzing a claim of a sexually hostile work environment); *see also Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) ("[T]he same principles that govern sexual harassment also govern claims of racial harassment."). "[O]nly harassment *based on the plaintiff's race* [or gender] may be considered." *Williams*, 643 F.3d at 511 (emphasis in original) (citing *Bowman*, 220 F.3d at 464).

In evaluating this element, courts must consider all of the circumstances, including the frequency of the discriminatory conduct; the severity of the conduct; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance. *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir. 2008). The conduct complained of "must be extreme to amount to a change in the terms and conditions of employment," and "simple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to

13

discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quotations omitted). A work environment viewed in its totality may satisfy the standard of an abusive work environment, even if no single episode rises to the level of a hostile work environment. *Williams*, 187 F.3d at 564.

In support of her claims, plaintiff points to her "countless unfounded write-ups," the alleged dissimilar treatment of black and white employees, her demotion, the drug testing procedure, the difference in pay between her and her co-workers, the revocation of her STR, the failure to investigate her claims of harassment and discrimination, the denial of training opportunities, the use of "demeaning and foul language" toward women, her request for FMLA leave due to her stress from work, and her retaliatory discharge [Doc. 42 pp. 28–29].

Upon review, and viewing the facts in the light most favorable to plaintiff, the Court finds that plaintiff is unable to demonstrate how the alleged harassment was based on her gender or race. Plaintiff admits that her STR authority was revoked "after an Ethics department investigation into a procurement incident[,]" and she does not provide evidence for how this investigation or the revocation of her STR was based on her gender or race [Doc. 42 ¶ 10]. While she submits that her supervisor—a white male—still has his job, she has failed to provide evidence such that a reasonable juror could find that defendant's decision to revoke her STR, and not that of her supervisor, was based on gender or race.

14

As for her drug testing, plaintiff states that "[n]o other employee white, black, male, or female is known to have been required to give observed drug screens for missed drug screens" [*Id.* ¶ 33]. She provided no other evidence to demonstrate how defendant's decision to have plaintiff provide an observed drug screen was a result of her race or gender. While plaintiff submits that a white employee was not required to give an observed drug test after he missed his initial test, she failed to demonstrate how the circumstances surrounding his missed drug screen were similar to hers [Doc. 42 ¶ 35]. She simply states that, because there is "no distinction" in defendant's regulations between the differing circumstances for why an employee provides an untimely drug screen, one can conclude that defendant had plaintiff provide an observed drug test because of her gender or race [*Id.*]. As support for this statement, however, plaintiff cites to her own deposition testimony, in which she states she was not offered the chance to provide a late drug test because "that's not what the policy says" [Doc. 42-5 p. 34]. Upon review of this evidence, plaintiff has not provided evidence such that a reasonable juror could find that she was required to take an observed drug test due to her gender or race.

Plaintiff also states she was "denied leadership training, business trips, and advancement opportunities" whereas white males "frequently" went on trips with LeVan [Doc. 42 ¶ 44; Doc. 42-5 p. 28]. She admits, however, that the white males who traveled with LeVan had different job responsibilities than she did, and were not in her department [Doc. 42-5 pp. 28–29]. Other alleged dissimilar treatment between black and white employees includes how plaintiff needed to knock on LeVan's door, while white

15

individuals did not [Doc. 42 ¶ 47]. Plaintiff did not provide any support for this allegation, however, and defendant has produced the e-mail at issue, in which LeVan simply informed plaintiff that it is a "common courtesy" to knock on someone's office door prior to entering [Doc. 40-1 p. 297]. Plaintiff has failed to demonstrate how LeVan requested this of her due to her race.

In support of her allegation of "countless unfounded write-ups," plaintiff submits that she was cited in an e-mail from LeVan regarding her attendance and timing at work [Doc. 42 ¶ 53]. Plaintiff states that white salaried employees, on the other hand, were allowed to come in and leave when they wanted [*Id.*]. Plaintiff has not demonstrated, however, how LeVan emailed her regarding her attendance and timeliness due to her race or gender, and has not provided any evidence to support her allegation regarding the policy toward white employees.

The only potentially gender-derogatory comment alleged by plaintiff for which she provides evidentiary support is that LeVan would sometimes use the word "bitch," including to describe Bishop [*Id.* ¶ 48]. Plaintiff admits, however, that this language was part of the "culture" of foul language at work [Doc. 42 ¶ 23], and while she found this language offensive at first, she soon "let it go" and did not let it bother her [Doc. 42-5 p. 820]. The Court finds this is insufficient to demonstrate that plaintiff was harassed based on her gender. *See Harris*, 510 U.S. at 21–22 ("if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment"); *see also Smith v. Leggett Wire Co.*, 220 F.3d

16

752, 760 (6th Cir. 2000) (finding sporadic comments by supervisors and co-workers were so infrequent and spread out over time that plaintiff failed to present a *prima facie* case of hostile work environment); *Norman v. Rolling Hills Hosp., LLC*, 820 F. Supp. 2d 814, 821–22 (M.D. Tenn. 2011) (granting summary judgment for defendant where plaintiff's hostile work environment claim relied on general harsh tones of supervisor combined with sporadic comments about how "they were not 'in the hood'" and plaintiff looked like Buckwheat).

In reviewing all of this evidence, taken together, a reasonable jury could not find that plaintiff was harassed because of her gender or race. Plaintiff presents no evidence of a nexus, such that the Court could find a genuine issue of material fact that any of her alleged treatment was based on her gender or race. *See Jordan v. City of Cleveland*, 464 F.3d 584, 596 (6th Cir. 2006) ("it is axiomatic that [a plaintiff] must provide a causal nexus between his race and the complained-of conduct.").

The Court also finds that plaintiff has not demonstrated how this alleged conduct was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Williams*, 643 F.3d at 511. The alleged conduct was not "extreme to amount to a change in the terms and conditions" of her employment. *Faragher*, 524 U.S. at 788. While plaintiff may have been subjected to simple teasing, cited for tardiness, and required to knock on her supervisor's door before entering, no reasonable jury could find that these incidents were sufficiently serious such that they would amount to a discriminatory change in her employment.

17

In sum, considering the frequency and severity of this harassing conduct, whether it was physically threatening or humiliating, and whether it unreasonably interfered with plaintiff's performance, the Court finds that plaintiff is unable to demonstrate how she worked in a hostile work environment due to her gender or race. *See Batuyong v. Gates*, 337 F. App'x 451, 457 (6th Cir. 2009) (affirming dismissal of hostile environment claim based on "various incidents in which [the plaintiff] was criticized by her supervisors, resulting in feelings of depression and humiliation"); *EEOC v. Harbert-Yeargin, Inc.*, 366 F.3d 498, 506 (6th Cir. 2001) (noting Title VII was not intended to serve as a civility code in the workplace). Plaintiff's hostile work environment claim based on her gender and race is thereby dismissed.

## B.     Wrongful Termination Claim

Plaintiff alleges that she was wrongfully terminated due to her gender and race, in violation of Title VII and § 1981.[3] "Discrimination claims brought pursuant to [Title VII] are traditionally categorized as either single-motive claims, *i.e.,* where an illegitimate reason motivated an employment decision, or mixed-motive, *i.e.,* where both legitimate and illegitimate reasons motivated the employer's decision." *Williams v. Zurz*,

---

[3] In response to defendant's summary judgment motion, plaintiff only responds that her race-based termination claim does not fail as a matter of law [Doc. 42 p. 21]. Plaintiff does not respond to defendant's assertion that her wrongful termination claim based on gender also fails as a matter of law. Accordingly, the Court concludes that plaintiff has waived any opposition to defendant's argument that plaintiff's claim for wrongful termination based on gender should be dismissed. *See Taylor v. Unumprovident Corp.*, No. 1:03-CV-1009, 2005 WL 3448052, at *2 (E.D. Tenn. Dec. 14, 2005) (a responding party waives opposition to an opponent's argument when it fails to respond to that argument). Plaintiff's claim for wrongful termination based on gender is therefore dismissed.

503 F. App'x 367, 374–75 (6th Cir. 2012) (hereinafter "*Zurz*") (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008)).  Plaintiff submits that her race-based wrongful termination claim should survive under the mixed-motive theory,[4] and that even under a single-motive theory she is able to establish pretext under the *McDonnell Douglas* burden shifting analysis.

The Sixth Circuit has been inconsistent about whether § 1981 claims may also be analyzed under a mixed-motive standard, instead of just Title VII claims.  *Compare Zurz*, 503 F. App'x at 374–75 (stating that although Title VII and § 1891 claims share the same prima facie test, the Sixth Circuit has held that the Title VII mixed-motive standard does not modify the *McDonnell Douglas* analysis used in § 1981 suits); *with Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 757 (6th Cir. 2012) (applying the mixed-motive standard to both Title VII and § 1981 claims).

Upon review, however, the Court finds that regardless of whether plaintiff's race-based wrongful termination claims under both Title VII and § 1981 are analyzed under the mixed-motive analysis, or whether the § 1981 claim is analyzed under the *McDonnell Douglas* standard, plaintiff has failed to meet her burden to overcome defendant's summary judgment motion under either inquiry.  *See Zurz*, 503 F. App'x at 375 (noting

---

[4] Even though plaintiff only raised this mixed-motive theory in response to defendant's summary judgment motion, the Court finds that plaintiff's response adequately notified defendant of this new argument.  *See Copeland v. Regent Elec., Inc.*, 499 F. App'x 425, 435–36 (6th Cir. 2012) (stating that "[a] plaintiff may sufficiently notify a defendant of an argument by raising it in a response to summary judgment" and finding that raising a mixed-motive theory in response to a summary judgment motion provided sufficient notice) (citation omitted).

19

that, under either the single-motive or mixed-motive inquiries, the plaintiff failed to meet her burden to overcome the defendant's summary judgment motion).

### 1. Single-Motive Claim

Turning first to plaintiff's single-motive claim, a plaintiff can establish unlawful discrimination "by introducing direct evidence of discrimination . . . or by introducing indirect evidence of discrimination to shift the burden of production to the employer to articulate a legitimate, nondiscriminatory reason for making the adverse employment decision." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996) (citations omitted), *abrogated on other grounds by Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 315–16 (6th Cir. 2012) (en banc). "The direct evidence and circumstantial evidence paths are mutually exclusive; a plaintiff need only prove one or the other, not both." *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348–49 (6th Cir. 1997).

Where, as here, plaintiff points to no direct evidence of discrimination in a single-motive claim, courts analyze discrimination claims following the burden shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Under the *McDonnell Douglas* burden-shifting framework, plaintiff must first set out a prima facie case of discrimination. *Williams v. Union Underwear Co.*, 614 F. App'x 249, 253 (6th Cir. 2015). After plaintiff establishes a prima facie case of discrimination, the burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the employment action. *Id.* at 253–54. If defendant does so, then the burden returns to plaintiff to prove that the stated reason is a pretext for disability discrimination. *Id.*

20

To make out a prima facie case of wrongful termination, plaintiff must show: (1) membership in a protected class; (2) that she suffered an adverse employment action; (3) that she was qualified for the position; and (4) that she was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees. *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006).

Even assuming plaintiff is able to make out this prima facie case, defendant has presented a legitimate, non-discriminatory reason for her termination—plaintiff's insubordination toward a supervisor. Plaintiff must therefore demonstrate how this was a pretext for unlawful discrimination. Upon review and as analyzed herein, the Court finds that plaintiff's claim fails under pretext.

"Plaintiffs may show that an employer's proffered reasons for an adverse employment action are pretext for discrimination if the reasons '(1) have no basis in fact; (2) did not actually motivate the action; or (3) were insufficient to warrant the action.'" *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 431 (6th Cir. 2014) (quoting *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012)). The Sixth Circuit has retreated from formulaic application of these categories and stresses that they serve only as a tool to assist the court in addressing the ultimate inquiry: "did the employer fire the employee for the stated reason or not?" *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009). Plaintiff's burden is to demonstrate that defendant's decision was "so unreasonable as to be disbelieved." *Sybrandt v. Home Depot*, 560 F.3d

553, 561 (6th Cir. 2009) (finding no pretext when the employer did not act inconsistently with its prior practice, and had conducted a reasonable investigation prior to terminating the plaintiff). "[A] reason cannot . . . be a pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason." *Seeger*, 681 F.3d at 285 (alteration in original) (quotation marks omitted) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

In the Sixth Circuit, the "honest belief rule" prevents an employee from establishing pretext if the employer "honestly believed in the proffered reason given for its employment action[,]" even if the employer's reason is "ultimately found to be mistaken, foolish, trivial, or baseless[.]" *Banks*, 610 F. App'x at 533 (quoting *Smith v. Chrysler Corp.,* 155 F.3d 799, 806 (6th Cir. 1998)). The plaintiff must "show 'more than a dispute over the facts upon which the discharge was based.'" *Seeger*, 681 F.3d at 285 (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001)). To be protected by the honest belief rule, the employer's decision-making process need not "be optimal" or leave "no stone unturned," but rather the "key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.* (citing *Chrysler Corp.*, 155 F.3d at 807). The employer's belief, however, must be "reasonably based on particularized facts rather than on ignorance and mythology." *Banks*, 610 F. App'x at 533.

22

Here, therefore, it is not enough for plaintiff to show that defendant was incorrect about plaintiff's statements in the Wellness Center and ignoring Bishop's order to not retrieve her own purse. As long as defendant had "an honest belief" that plaintiff had ignored Bishop—her supervisor—and used what it perceived to be abusive or threatening language to describe her, in violation of its standards of conduct, plaintiff cannot establish that the reason for her termination was pretextual, even if it is ultimately shown to be incorrect.

To demonstrate pretext, plaintiff states that she was replaced by a less-qualified white male [Doc. 42 p. 24]. She argues that, had defendant's true reason for terminating plaintiff been due to her insubordination rather than for discriminatory reasons, defendant could have terminated her on the day of the event (November 2, 2011), or on the day Human Resources spoke with witnesses (November 7, 2011) [*Id.* p. 25].[5] Instead, defendant waited until November 22, 2011 in which to terminate her [*Id.*]. She states she was terminated one day after defendant received notice of her request to extend her FMLA leave, and of her EEOC claim [*Id.*]. She also states that her alleged language did

---

[5] Plaintiff also states that defendant never interviewed plaintiff when conducting its investigation [Doc. 42 p. 26]. The Court notes, however, that defendant relied upon its interviews with other employees in determining what occurred in the Wellness Center, which is sufficient to provide it with an honest belief [Doc. 47 p. 21]. *See Auble v. Babcock & Wilcox Tech. Servs. Y-12, LLC*, No. 3:13-CV-422-TAV-HBG, 2015 WL 6049825, at *6 (E.D. Tenn. Oct. 15, 2015) ("The managers did not need personal knowledge of the underlying events in order to come to a decision."); *see also Seeger*, 681 F.3d at 286 ("an 'optimal' investigation— i.e., interviewing the employee and some or all of his witnesses—is not a prerequisite to application of the honest belief rule.").

not abuse or threaten anyone, that she did not use the language directly to her supervisor, and that there was a culture of foul language at defendant's office [*Id.*].[6]

In considering the first factor, the Court finds that defendant's proffered reason for terminating plaintiff—her insubordination—had a basis in fact. Defendant provided evidence from two other employees who reported hearing plaintiff use offensive language, including the terms "fucking" and "bitch," when she entered the Wellness Center [Doc. 40-1 pp. 3, 16]. Plaintiff admits that she may have used the word "bitch" but states that her "language did not abuse or threaten anyone" and "was not stated directly to her supervisor" [Doc. 42 ¶ 22; Doc. 42 p. 25]. She also states that the "culture of foul language" at her office included how employees "made similar derogatory remarks about their supervisors and other employees on a regular basis" [*Id.* p. 35]. Plaintiff admits, however, that defendant's employee handbook prohibits using threatening language while on premises, and refusing to carry out verbal instructions [Doc. 43-5 p. 81]. Plaintiff also admits that, had she called Bishop a bitch to her face, it would be appropriate for defendant to discipline her [Doc. 42 ¶ 23].

While plaintiff disputes defendant's claim that she ignored Bishop's order that plaintiff not retrieve her purse from her office herself, defendant provided evidence that plaintiff used language that could be considered threatening or abusive in her workplace.

---

[6] Plaintiff does not make arguments as to each of the three ways of demonstrating pretext and instead simply discusses pretext generally. The Court will apply these arguments to each of the factors, but notes that none of the evidence on which plaintiff relies supports a finding that insubordination toward a supervisor is insufficient to warrant termination from employment, and thus, the Court will only analyze the other two prongs in the pretext inquiry.

24

Defendant conducted an investigation into what transpired on November 2, 2011, and only decided to terminate plaintiff after interviewing other employees who confirmed plaintiff's statements in the Wellness Center that day [Doc. 40 ¶ 19]. Plaintiff's burden is to demonstrate that defendant's decision was "so unreasonable as to be disbelieved." *Sybrandt*, 560 F.3d at 561. As plaintiff admits that she may have used the term "bitch"—one of the primary bases for her termination—even when viewing the facts in the light most favorable to plaintiff, the Court finds that her termination did have a basis in fact.

Turning to the second factor, one of plaintiff's primary arguments for demonstrating that defendant's proffered reason did not actually motivate defendant's action is because she was terminated twenty days after her alleged incident of insubordination, and only one day after defendant received notice of her request to extend her FMLA leave and of her EEOC claim [Doc. 42 p. 25].

The Court notes that even though plaintiff was terminated only one day after defendant received notice of her request to extend her FMLA leave and of her EEOC claim, "the law in this circuit is clear that temporal proximity cannot be the sole basis for finding pretext." *Donald v. Sybra, Inc.*, 667 F.3d 757, 762–63 (6th Cir. 2012) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001)) (stating that despite the "peculiar timing" of plaintiff being terminated the day she returned from her medical absence, this could not be her sole basis for proving pretext).

The evidence before the Court also supports defendant's claim that it honestly believed in its legitimate, nondiscriminatory basis for terminating plaintiff. The record

25

includes evidence of defendant's detailed investigation, which it began immediately after it received notice about her conduct [Doc. 47 p. 19]. Plaintiff does not dispute this assertion [Doc. 42 ¶ 26]. This investigation included conducting employee interviews, in order to discern what transpired on November 2, 2011 [Doc. 47 p. 19]. Every aspect of this investigation, except the statements from plaintiff herself, corroborated that plaintiff had ignored her supervisor's request and that she used the terms "bitch" and "fucking" in the Wellness Center [Doc. 40 ¶ 18 n.3, n.4].

The evidence also demonstrates how Reis decided to terminate plaintiff on November 14, 2011, at the conclusion of the investigation, but that the company delayed terminating plaintiff because of its long-standing practice of attempting to conduct terminations in person [Doc. 40 ¶¶ 19–20]. Defendant sent plaintiff a letter of termination when she cancelled her meeting with Bishop scheduled for the date of her return from FMLA leave [*Id.*]. In reviewing this investigation, no reasonable jury could find that defendant did not make a reasonably informed or considered decision before deciding to terminate plaintiff. *Seeger*, 681 F.3d at 285.

Plaintiff's next allegation—that her replacement was less qualified than she was—is not substantiated by the record. Rather, defendant has presented evidence that Hall was paid a greater salary than plaintiff because he was a licensed physical therapist, unlike plaintiff, and therefore could perform physical therapy services for other employees while serving as Wellness Coordinator [Doc. 47-1 p. 5]. Defendant submits this justified paying him a higher salary than plaintiff [*Id.*].

26

Finally, even though plaintiff claims there was a "culture" of foul language at her workplace, plaintiff admits that the employee handbook forbade the use of threatening language. As such, the Court finds plaintiff's assertion is insufficient to demonstrate how defendant's stated reason for plaintiff's termination was a pretext for race discrimination.

In sum, the Court finds that, even though plaintiff disputes that the event giving rise to defendant's stated reason for termination actually occurred, no reasonable jury could find that defendant did not terminate plaintiff for its stated reason. The Court also finds that defendant honestly believed in the proffered reason for plaintiff's termination. Accordingly, plaintiff is unable to prove that defendant's stated legitimate, nondiscriminatory reason for her termination was just pretext for discrimination.

### 2. Mixed-Motive Claim

Under a mixed-motive claim, to overcome a summary judgment motion, plaintiff "need only produce enough evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex, or national origin was *a* motivating factor' for the defendant's adverse employment action." *Zurz*, 503 F. App'x at 375 (emphasis in original) (quoting 42 U.S.C. § 2000e–2(m)). This burden is "not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *White*, 533 F.3d at 400.

Plaintiff need not "eliminate or rebut all the possible legitimate motivations of the defendant" so long as plaintiff can demonstrate that "an illegitimate discriminatory

animus factored into the defendant's decision." *Id.* at 401. "Nonetheless, this standard does require *some* evidence of discriminatory bias that has some connection to the adverse employment action." *Lopez v. Am. Family Ins. Co.*, 618 F. App'x 794, 800 (6th Cir. 2015) (citing *Reed v. Procter & Gamble Mfg. Co.*, 556 F. App'x 421, 429 (6th Cir. 2014) (emphasis in original) (denying plaintiff's mixed-motive claim because the record contained no evidence that the person with decision-making authority harbored animus toward African-Americans).

Defendant alleges that plaintiff's mixed-motive claim should fail because she only makes arguments as to a single motive, she does not allege any permissible or legitimate considerations existed for her termination, and she fails to show a connection between the discrimination bias and her termination [Doc. 47 pp. 29–30]. Plaintiff points to the same evidence as in her single-motive claim, and submits that this demonstrates that her race was a motivating factor in defendant's decision to terminate her [Doc. 42 p. 25].

Upon review, the Court finds that plaintiff has failed to point to any evidence to demonstrate that her race was a motivating factor in defendant's decision to terminate her. Even though she was replaced by a white male and disputes that she ignored Bishop's order that she not retrieve her own purse, these facts, even when taken in consideration with plaintiff's other arguments, do not provide the Court with evidence that defendant considered her race in taking its adverse employment action.

The evidence before the Court demonstrates how Reis decided to terminate plaintiff only after being briefed on the Human Resources investigation into (1) plaintiff's conduct in allegedly ignoring Bishop and (2) plaintiff's statements in the Wellness Center [Doc. 40-1 p. 26]. Plaintiff has not provided any evidence, and has not alleged, that Reis harbored any discriminatory animus. Plaintiff also has not alleged the "cat's paw" theory, that a biased subordinate employee who lacks decision-making power influenced Reis to make an adverse employment action. *Arendal v. City of Memphis*, 519 F.3d 587, 604 n.13 (6th Cir. 2008). Plaintiff submits that one of the witnesses to the investigation may have had reason to be upset with plaintiff [Doc. 42 p. 8]. Plaintiff has not presented evidence, however, that this witness lied, or that her statements were unsubstantiated by other interviewees. Rather, the record contains evidence that multiple employees were interviewed as part of this investigation, rather than just the one who had reason to be upset with plaintiff. While plaintiff also argues that defendant's decision to not interview plaintiff as part of the investigation was flawed, the Court has already found that defendant was not required to interview plaintiff. In sum, plaintiff has failed to plead the "cat's paw" theory, and, even if she had, has failed to satisfy it. *See, e.g.*, *Reed*, 556 F. App'x at 429 (finding that the plaintiff's mixed-motive theory failed because, while the plaintiff indicated that some employees felt discriminatory animus, he did not identify how they influenced the decision-maker).

Finally, even though plaintiff was terminated shortly after defendant learned that she had filed a charge with the EEOC and was extending her FMLA leave, she has not

29

pointed to any evidence of discriminatory bias that motivated defendant's termination decision. Accordingly, as plaintiff has failed to provide "*some* evidence of discriminatory bias that has some connection" to her being terminated, she has failed to satisfy her burden under a mixed-motive claim. *Lopez*, 618 F. App'x at 800. As plaintiff is unable to satisfy her burden under both her single-motive and mixed-motive claims, plaintiff's claim of wrongful termination due to race discrimination is dismissed.

## C. FMLA Retaliation and Interference Claims

Plaintiff claims defendant terminated her in retaliation for taking FMLA leave, and interfered with her ability to take FMLA leave when it terminated her.[7] To state a claim of FMLA retaliation under 29 U.S.C. § 2615(a)(2), plaintiff must demonstrate:

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006) (citing *Arban v. W. Publ'g Corp.*, 345 F.3d 390, 404 (6th Cir. 2003)). Plaintiff bears the burden of

---

[7] In its motion for summary judgment, defendant states that, assuming plaintiff intended to bring an FMLA interference claim, she is unable to create a factual dispute as to whether defendant's termination decision was based on a legitimate business reason [Doc. 40 p. 27]. To rebut a claim of FMLA interference, when an employer offers a legitimate reason unrelated to the exercise of FMLA rights for terminating the plaintiff, the plaintiff "may seek to rebut it by showing, among other things, that the excuse was insufficient to warrant the challenged conduct." *Romans v. Mich/ Dep't of Human Servs.*, 668 F.3d 826, 841 (6th Cir. 2012) (citing *Grace v. USCAR*, 521 F.3d 655, 670 (6th Cir. 2008)). In response to defendant's motion, however, plaintiff only makes arguments as to her FMLA retaliation claim [*see* Doc. 42 pp. 25–27]. Accordingly, the Court concludes that plaintiff has waived any opposition to defendant's argument that any claim plaintiff makes for FMLA interference should be dismissed. *See Taylor*, 2005 WL 3448052, at *2.

demonstrating the causal connection, and must demonstrate that the employer's reasons for terminating her were a pretext for terminating her due to her medical leave. *Id.*

As plaintiff's claim is based on indirect evidence, the court must apply the *McDonnell Douglas* burden-shifting framework, in which plaintiff must first set out a prima facie case of discrimination. *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 408–09 (6th Cir. 2014). Plaintiff must simply meet a "low threshold of proof" in order to establish a prima facie case of retaliatory discharge. *Seeger*, 681 F.3d at 283. If plaintiff satisfies this burden, then defendant must demonstrate a legitimate, nondiscriminatory reason for plaintiff's termination, and then plaintiff must demonstrate that reason is merely a pretext for discrimination. *Id.* at 285 (applying the pretext factors to a FMLA retaliation claim).

The Court has already found that, even assuming plaintiff can make out her prima facie case, she is unable to prove that defendant's proffered legitimate, nondiscriminatory reason for her termination was a pretext for discrimination. Accordingly, the Court finds that its previous pretext analysis applies, and plaintiff's FMLA retaliation claim is dismissed.

### D. Disability Discrimination

Plaintiff also alleges that defendant discriminated against her due to her disability [Doc. 42 p. 29]. Where, as here, plaintiff points to no direct evidence of discrimination, courts analyze ADA discrimination claims following the burden shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). The same pretext factors that

applied to plaintiff's wrongful termination claim are also applicable to plaintiff's disability discrimination claim. *See, e.g.*, *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364–65 (6th Cir. 2007) (applying the pretext factors to a disability discrimination claim). Even assuming plaintiff is able to establish a prima facie case of discrimination, the Court has already found that she is unable to meet her burden in demonstrating how defendant's legitimate, nondiscriminatory reason for terminating her was a pretext for discrimination. Accordingly, plaintiff's disability discrimination claim is dismissed.

### E.     Retaliation Claim

Finally, plaintiff also alleges that defendant retaliated against her, in violation of Title VII. "Courts analyzing retaliation claims apply the *McDonnell Douglas/Burdine* framework of shifting burdens of production and proof." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007) (citation omitted). The pretext analysis applied to plaintiff's wrongful termination claim also applies to plaintiff's retaliation claim. *See, e.g.*, *Chen v. Dow Chem. Co.*, 580 F.3d 394, 402 (6th Cir. 2009) (applying the same pretext factors to a retaliation claim). As the Court has already found that plaintiff is unable to demonstrate pretext, plaintiff's Title VII retaliation claim is dismissed. *See id.* (stating that it "need not address whether [the plaintiff] established a prima facie case of retaliation, because she has failed to create a genuine issue of material fact as to pretext" and thus the defendant was entitled to summary judgment on the retaliation claim as well).

## IV. Conclusion

For the reasons stated herein, the Court will **GRANT** the Motion for Summary Judgment by Babcock & Wilcox Technical Services Y-12, LLC [Doc. 35] in all respects. The Court will **DISMISS** all of plaintiff's claims and **DIRECT** the Clerk of Court to **CLOSE** this case.

ORDER ACCORDINGLY.


s/ Thomas A. Varlan
CHIEF UNITED STATES DISTRICT JUDGE